IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | |
|---|---|
| VERGIL EURISTI MARTINEZ | § |
| | § |
| v. | §  CIVIL ACTION NO. G-02-718 |
| | § |
| DOUG DRETKE, DIRECTOR | § |
| OF TDCJ-CID | § |

**OPINION AND ORDER**

Before the Court is that portion of Petitioner Vergil Euristi Martinez's Application for a Writ of Habeas Corpus relating to the allegation that his trial attorneys provided ineffective assistance of counsel by inadequately investigating temporal lobe epilepsy ("TLE") as mitigating evidence at the punishment phase of his trial. *See Martinez v. Dretke*, 111 Fed. Appx. 224 (5th Cir. 2004). On June 30, 2003, this Court denied Petitioner's claim on this issue. The Fifth Circuit vacated that portion of the District Court's Order and remanded the case with instructions to hold an evidentiary hearing. The Magistrate Judge held a two-day hearing on June 6-7, 2005, and additional deposition evidence was submitted to the Court. On November 9, 2005, the Magistrate Judge issued a Report and Recommendation advising that habeas relief be granted. The State has filed extensive Objections.

In light of this Court's June 30, 2003, Order and the State's comprehensive overview of this case's background, the Court forgoes a summary of the facts underlying the issues before it. The State first objects that the Magistrate Judge did not follow the standards for habeas review set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA") because he conducted an analysis independent of the state court's decision. This claim is without merit. The entire point of this

proceeding was to gather additional factual information that was not presented to the state court or this Court in earlier habeas review. Nevertheless, a federal court may not grant relief on a claim that a state court has adjudicated on the merits "unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "A state court's decision constitutes an unreasonable application of clearly established federal law if it is objectively unreasonable." *Pondexter v. Dretke*, 346 F.3d 142, 146 (5th Cir. 2003). The question of whether counsel's representation was constitutionally adequate is governed by the familiar *Strickland* standard set forth in this Court's earlier ruling.

The Fifth Circuit's remand order required this Court to conduct a hearing and determine "whether counsel's investigation was unreasonably deficient and, if so, whether counsel's failure to investigate this condition and produce evidence relating to it amounted to ineffective assistance of counsel." *Martinez*, 111 Fed. Appx. at 230. The order posed three specific fact issues that required clarification in the evidentiary hearing: (1) how much of the information in Dr. Theodore Pearlman's February 27, 1997, report did Jerri Yenne learn in her investigation? (2) how much of Dr. Anand Mehendale's affidavit testimony given in state court concerning post-seizure aggression, lack of treatment, and future dangerousness did Yenne learn? and (3) how much of Petitioner's school records did Yenne read, and did she consider how Petitioner's behavioral problems noted therein relate to TLE?

The Magistrate Judge determined that Yenne received the Pearlman report during her investigation. However, Yenne did not learn of the facts stated in Dr. Mehendale's affidavit because she made no inquiries concerning these issues when she met with him at the Kerrville state hospital

in April, 1997. As the Report and Recommendation shows, Yenne had not asked Mehendale before trial about his medical opinion on Petitioner's post-seizure aggression, lack of treatment, and future dangerousness. Nor had she ever asked Mehendale to distinguish between TLE and other forms of epilepsy. Finally, the record is quite clear that Yenne read Petitioner's school records but never asked Pearlman or Mehendale to explain how TLE might account for any behavioral problems. Indeed, she admitted that she never considered any of the records in light of the effects of TLE. Hearing Transcript ("HT"), Vol. 3 at 57.

The State admits that the following fact findings in the Report and Recommendation are correct:

(1) counsel made no inquiries of Pearlman concerning possible diminished capacity;

(2) there is no indication that counsel asked whether Petitioner's future dangerousness could be controlled through treatment;

(3) counsel did not make any inquiry concerning the link between TLE and the aggression noted in Petitioner's school records;

(4) counsel did not discuss with any doctor the link between TLE and malingering;

(5) counsel did not ask questions about how medication given at the Kerrville hospital could have caused his aggressive behavior there;

(6) counsel did not discuss the conflicts between Pearlman's and Mehendale's opinions, did not inquire if they were reconcilable on key issues, and did not ask Mehendale to review the school records;

(7) counsel did not ask Mehendale anything about Petitioner's future dangerousness, did not ask him to distinguish between TLE and other forms of epilepsy, and failed to ask about the link between TLE and post-seizure aggression;

(8) counsel did not pursue issues raised in the Pearlman report with Mehendale other than the limited issue of whether Petitioner could have committed the crimes while having an acute seizure; and,

  (9) counsel made no inquiry about the differences between epilepsy and TLE and did not seek to understand the specific nature of Petitioner's condition.

Objections at 11. This essentially concedes the Magistrate Judge's conclusion that defense counsel's investigation into mitigation issues was inadequate in this case. Defense counsel Stan McGee stated that he never had any knowledge of the link between epilepsy and violence. HT, Vol. 1 at 64. Yenne herself admitted that she never made any inquiry concerning violence and epilepsy other than a brief conversation she had with Pearlman.

  The evidentiary record further shows that Yenne never grasped the distinction between TLE and other forms of epilepsy. As the Fifth Circuit noted, Mehendale's affidavit stated that people who suffer from TLE "endure rather strange and unusual seizures" that in the past have been linked to possession; they have much greater rates of psychoses than non-TLE epileptics; and they are "odd, bizarre patients." Respondent's Ex. C. As the Magistrate Judge correctly found, Yenne made no inquiry into this condition or how it related to Petitioner. When asked if she did anything to investigate TLE, she responded: "not on this case, just being aware of epilepsy, but not temporal lobe epilepsy. I had never encountered anything that would have suggested it . . . I did not have an inquiry with an expert in temporal lobe epilepsy." Id. at 52-53. Based on the findings stated in the Report and Recommendation, counsel's investigation into Petitioner's TLE and the link between this condition and violence does not meet the *Strickland* standard.

  The State argues at length that counsel's decision not to put on mitigation evidence of Petitioner's TLE was a strategic decision. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*,

4

466 U.S. at 690-91). Arguments that Yenne strategically chose not to present TLE evidence fail because she simply did not know of the link between TLE and violence, how TLE might explain Petitioner's school records, how it might be related to his prior behavior, or what treatment options concerning future dangerousness were available. "If trial counsel's investigation was unreasonable, then . . . deference to the strategic decision trial counsel made [is] also objectively unreasonable." *Smith v. Dretke*, 422 F.3d 269, 280 (5th Cir. 2005).

The State argues that any mitigation evidence would have been futile, in part, because the jury could not have followed the argument. Counsel also relied on the futility argument in the evidentiary hearing by claiming that they believed a death sentence was virtually guaranteed in this case. Nevertheless, this does not provide a reason for not investigating the link between Petitioner's condition and his crimes. The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases state that counsel "may not sit idly by, thinking that investigation would be futile. The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each." ABA Guidelines (1989) at 15-16. While the State is correct in noting that these guidelines are not binding on a federal court's decision, the Supreme Court has clearly indicated that they should be taken into consideration. *Wiggins*, 539 U.S. at 527.

Counsel stated that they chose not to put on TLE mitigation evidence because it would have contradicted Petitioner's claim in the guilt/innocence phase that he was not guilty. This Court's reading of the evidentiary transcript leads it to agree with the Magistrate Judge that neither attorney was able to provide a reason why the contradiction between a claim of not guilty at one phase of trial prevented the introduction of TLE evidence under these particular facts. Such a contradiction exists in all murder trials when the defendant claims to be not guilty, yet the State does not argue that

5

mitigation evidence is necessarily precluded in all instances.  Certainly, some cases could justify withholding mitigation evidence for this reason, but in the evidentiary hearing counsel relied primarily on the fact of the contradiction itself rather than a considered balance of the specific facts involved here.  As the State admits, Petitioner was convicted with the support of significant eyewitness testimony concerning his identity as the murderer.  The State has not shown how residual doubt about identity in the punishment phase justified the exclusion of mitigation evidence that could have brought Petitioner's serious medical condition to light.  Equally important, as a strategic decision this suffers from the fact noted above that counsel did not adequately understand the TLE mitigation evidence available to them and therefore could not have made a meaningful choice not to present it.

In deciding if Petitioner has been prejudiced by this failure, the Court must "reweigh the evidence in aggravation against the totality of the available mitigating evidence." *Wiggins*, 539 U.S. at 534.  This Court shares the Magistrate Judge's concern over the brutal nature of these crimes, which involved the deaths of two children.  However, the mitigating evidence presented was minimal, and the evidence available was potentially of significant help to Petitioner.  As the Fifth Circuit remarked, the evidence that could have been available to counsel had they undertaken a proper investigation "would entitle Martinez to relief because it would have given the jury an explanation for [his] crime." *Martinez*, 111 Fed. Appx. at 229.  After examining the trial transcript and the record, the Court agrees with the Magistrate Judge's reasons for concluding that Petitioner has satisfied *Strickland*'s prejudice requirement, and it adopts the Report and Recommendation in its entirety.

Having given this matter *de novo* review under 28 U.S.C. § 636(b)(1)(C), this Court finds that the State's Objections do not controvert the Magistrate Judge's findings and that the Report

and Recommendation should be, and is hereby, **ACCEPTED**.

Accordingly, the " Petition for a Writ of Habeas Corpus by a Person in State Custody" of Vergil Euristi Martinez (Instrument No. 1) is **GRANTED** on the claim that his attorneys provided ineffective assistance of counsel by failing to properly investigate his temporal lobe epilepsy.

It is further **ORDERED** that the death sentence entered by the state court be **VACATED** and that a new punishment proceeding commence within 120 days of the date of this Order and Final Judgment. In the event of a timely-filed appeal, however, this Order shall be **STAYED** pending the resolution of the appeal.

**IT IS SO ORDERED**.

**DONE** at Galveston, Texas this 7th day of February, 2006.

_____
Samuel B. Kent
United States District Judge